UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAYBELLINE MUNGUIA,

    Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of
Social Security

    Defendant.
_____/

No. C 09-02440 PJH

**ORDER AFFIRMING THE ADMINISTRATIVE LAW JUDGE'S DECISION DENYING SOCIAL SECURITY BENEFITS**

## INTRODUCTION

Plaintiff Maybelline Munguia ("Munguia") seeks judicial review of the Commissioner of Social Security's ("the Commissioner's") decision denying her claim for disability benefits pursuant to 42 U.S.C. § 405(g). This action is before the court on the parties' cross-motions for summary judgment. Munguia failed to file a reply to the government's opposition brief. Having read the parties' papers and administrative record, and having carefully considered their arguments and relevant legal authority, the court GRANTS the Commissioner's cross-motion for summary judgment, DENIES Munguia's cross-motion for summary judgment, and AFFIRMS the Commissioner's final decision.

## BACKGROUND

Munguia filed an application for Supplemental Security Income ("SSI") on September 19, 2006, alleging disability beginning January 1, 1995 due to diabetes, sickle cell anemia, anemia, heart failure, obesity, and right arm pain. (A.R. 59, 67, 104-106.) Munguia's SSI applications were denied initially on March 21, 2007, (A.R. 59-63), and upon reconsideration on June 1, 2007. (A.R. 67-71.) Munguia filed a request for an

administrative hearing on June 12, 2007.  (A.R. 73.)  The hearing before Administrative Law Judge Robert P. Wenten ("the ALJ") took place on May 21, 2008.  (A.R. 15.)  At the hearing, Munguia was represented by her current attorney and testified on her own behalf. (A.R. 15-56.)  A vocational expert was present via telephone but did not testify to any substantive matter because the ALJ determined at the hearing that the disability determination would be based on subjective factors.  (A.R. 55-56.)

On February 18, 2009, the ALJ issued a decision and found Munguia not disabled under the terms of the Social Security Act.  (A.R. 8-13.)  The Appeals Council denied Munguia's request for review of the ALJ's decision, (A.R. 1-4), and the ALJ's decision became final.  (A.R. 1.)  Munguia then commenced this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## STATUTORY AND REGULATORY FRAMEWORK

The Social Security Act ("the Act") provides for the payment of disability insurance benefits to people who have contributed to the Social Security system and who suffer from a physical or mental disability.  See 42 U.S.C. § 423(a)(1).  To evaluate whether a claimant is disabled within the meaning of the Act, the ALJ is required to use a five-step analysis.  20 C.F.R. § 404.1520.  The ALJ may terminate the analysis at any stage where a decision can be made that the claimant is or is not disabled.  See Pitzer v. Sullivan, 908 F.2d 502, 504 (9th Cir. 1990).

At step one, the ALJ determines whether the claimant is engaged in any "substantial gainful activity," which would automatically preclude the claimant from receiving disability benefits.  See 20 C.F.R. § 404.1520(a)(4)(I).  If the claimant is not engaged in substantial gainful activity, at the second step, the ALJ must consider whether the claimant suffers from a severe impairment which "significantly limits [the claimant's] physical or mental ability to do basic work activities."  See 20 C.F.R. § 404.1520(a)(4)(ii).  The third step requires the ALJ to compare the claimant's impairment to a listing of impairments in the regulations.  If the claimant's impairment or combination of impairments meets or equals

the severity of any medical condition contained in the listing, the claimant is presumed disabled and is awarded benefits.  See C.F.R. § 404.1520(a)(4)(iii).

If the claimant's condition does not meet or equal a listing, the ALJ must proceed to the fourth step to consider whether the claimant has sufficient "residual functional capacity" ("RFC") to perform his past work despite the limitations caused by the impairment.  See 20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant cannot perform his past work, the Commissioner is required to show, at step five, that the claimant can perform other work that exists in significant numbers in the national economy, taking into consideration the claimant's " residual functional capacity and . . . age, education, and work experience."  See C.F.R. § 404.1520(a)(4)(v).

Overall, in steps one through four, the claimant has the burden to demonstrate a severe impairment and an inability to engage in his previous occupation.  Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995).  If the analysis proceeds to step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other work.  Id.

**ALJ's FINDINGS**

The ALJ determined that Munguia was not disabled at step five of the disability evaluation.  (A.R. 12.)

At step one, the ALJ noted that Munguia's earnings in 1983, 1985, and 1986 were minimal, and her limited work record and minimal earnings indicated that she had never engaged in any substantial gainful activity.  (A.R. 9.)  Therefore, the ALJ proceeded to step two of the disability determination.  (A.R. 9.)

The ALJ found at step two that Munguia suffers from the medically determinable impairments of anemia, uterine fibroid tumors, right upper extremity phlebitis, diabetes mellitus, and obesity.  (A.R. 9.)  Because these impairments significantly limited Munguia's ability to perform basic work activities, the ALJ found these impairments to be "severe."  (A.R. 9.)  However, the ALJ did not find Mugnuia's other claimed impairments, including a

heart condition and sickle cell disease, to be severe because they were not corroborated by medical evidence. (A.R. 9.)

At step three of the disability determination, the ALJ found that none of Munguia's impairments or combination of impairments met or equaled the impairments listed in the regulations. In so finding, the ALJ noted that Munguia's medical records did not describe the frequency of transfusions or persistently elevated hematocrit count required for listing level chronic anemia. (A.R. 9.) Similarly, the ALJ found that Munguia's medical records failed to adequately support listing level diabetes mellitus. (A.R. 9.) The ALJ noted that while obesity is no longer a listed impairment, the cumulative effects of Munguia's obesity are not medically equivalent to any listed impairment. (A.R. 9.) Finally, the ALJ determined that none of the medical findings in the record were equal in severity and duration to any of the listed impairments. (A.R. 10.)

The ALJ then considered Munguia's residual functional capacity and found that she had a residual functional capacity for light work. In making this determination, the ALJ reviewed the pertinent medical evidence, including records indicating that Munguia had been hospitalized in January 2006 based on complaints of fatigue, shortness of breath, lower extremity edema, and a history of heavy periods. (A.R. 10.) During that hospitalization, Munguia was diagnosed with severe anemia and possible reactive thrombocytopenia[1] with a decreased hematocrit[2] level and pancytopenia,[3] diabetes mellitus, and obesity. (A.R. 10.) An ultrasound also revealed a large uterine fibroid. (A.R. 10.) During this hospitalization, Munguia improved following a blood transfusion. (A.R. 10.)

---

[1] Thrombocytopenia is "[a] condition in which an abnormally small number of platelets is present in the circulating blood." STEDMAN'S MEDICAL DICTIONARY, 1984 (28th ed. 2006).

[2] Hematocrit is the "[p]ercentage of the volume of a blood sample occupied by cells." STEDMAN'S MEDICAL DICTIONARY at 862.

[3] Pancytopenia is a "[p]ronounced reduction in the number of erythrocytes all types of leukocytes, and the blood platelets in the circulating blood." STEDMAN'S MEDICAL DICTIONARY at 1411.

4

Several months later, in July 2006, Munguia reentered the hospital on complaints of weakness and shortness of breath. (A.R. 10.) Munguia was again diagnosed with acute and chronic anemia which improved after a blood transfusion. (A.R. 10.) Munguia received an additional diagnosis of borderline diabetes with a blood glucose of 225 mg/dL.[4] (A.R. 10.)

The ALJ then noted that medical records from a December 2006 visit to the Tiburcio Vasquez Health Center indicated that Munguia's hematocrit level was within normal limits after she reported that she had been taking iron as described. (A.R. 10.) Additionally, those medical records indicated that Munguia's diabetes was under control with a glucose level of 115 mg/dL. (A.R. 10.)

Subsequently, in 2007 and 2008, Munguia was seen several times at the Alameda County Medical Center ("Center"). (A.R. 10-11.) In July 2007, Munguia visited the Center on complaints of right arm pain due to a transfusion in July 2006 having missed her vein. (A.R. 10.) During an October 2007 visit to the Center, Munguia reported a headache only, and her glucose level was 199 mg/dL. (A.R. 10.) Although the Center called Munguia in the beginning of November to make a same-day appointment, she did not return for treatment until December 2007. (A.R. 10.) At the December 2007 visit, Munguia's glucose level was 279 mg/dL and a hepatitis B testing was reactive.[5] (A.R. 10.) During a March 2008 visit to the Center for complaints of arm and back pain, Munguia's anemia was described as probably due to her menses as well as due to noncompliance with her iron therapy. (A.R. 11.) The Center's medical records also indicated that Munguia missed two appointments for follow-up care in April 2008, (A.R. 273, 274), and the ALJ noted that there

---

[4] The record is unclear regarding the significance of these numbers. However, it appears that a diagnosis of diabetes mellitus "is confirmed when any two measurements of plasma glucose performed on different days yield levels at or above . . . 200 mg/dL" when tested at random. STEDMAN'S MEDICAL DICTIONARY at 529.

[5] The record is unclear about the significance of the "reactive" test for hepatitis B. However, hepatitis B was not one of the impairments alleged by Munguia, and it is only briefly addressed in the medical record. Without more information, the court will not consider this test as an instrumental factor in reviewing the ALJ's decision.

is no evidence that Munguia sought or received any subsequent treatment for any condition. (A.R. 11.)

Based on these objective medical findings, the ALJ determined that Munguia had been able to perform light work at all relevant times. (A.R. 11.) Then, the ALJ cited a February 2007 consultative examination performed by Dr. Sharma. (A.R. 10.) This examination was done at the request of the Department of Social Services to determine Munguia's residual functional capacity. (A.R. 253.) The ALJ noted that Dr. Sharma diagnosed Munguia with diabetes mellitus, uterine fibroids, anemia, and moderate obesity. (A.R. 10.) Dr. Sharma further concluded that Munguia could perform light work: lifting 10 pounds frequently and 20 pounds occasionally and standing and walking for six hours per day with normal breaks. (A.R. 10.)

As noted, based on the medical evidence, the ALJ agreed with Dr. Sharma that Munguia was able to perform light work. (A.R. 10) This was in spite of Munguia's assertions to the contrary.

In rejecting Munguia's claim that she was unable to perform any work, the ALJ first noted that Munguia's medical records after her 2006 hospitalizations described "sparse" treatment, missed appointments, and noncompliance with prescribed treatment. (A.R. 11.) The ALJ also pointed to discrepancies between Munguia's testimony about her elevated glucose levels and the objective medical record. (A.R. 11.) He noted that Munguia's testimony about her inability to reach comfortably with her right arm was uncorroborated by medical examination. (A.R. 11.) According to the ALJ, Munguia's testimony about her ongoing fatigue and shortness of breath was not reflected in the medical records. (A.R. 11.) Finally, the ALJ noted that Munguia was raising six children by herself without any other adult assistance. (A.R. 11.) The ALJ inferred that the substantial energy expended by raising her children would be undoubtedly more than the energy required from many sedentary or light jobs. (A.R. 11.)

Because Munguia had never performed any substantial gainful activity, the ALJ

could not determine whether she had sufficient residual functional capacity to perform her past work at step four of the sequential disability determination. (A.R. 11-12.) Therefore, the ALJ proceeded to step five and found that there were jobs existing in significant numbers in the national economy which Munguia could perform given her residual functional capacity for light work, age, education, and work experience. (A.R. 12.)

## STANDARD OF REVIEW

This court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the ALJ's findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." Holohan v. Massanari, 246 F.3d 1195 (9th Cir. 2001) (citation omitted). "Substantial evidence" means more than a scintilla, but less than a preponderance, or evidence which a reasonable person might accept as adequate to support a conclusion. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). The court is required to review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the court must uphold the ALJ's decision. Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).

## ISSUE

Munguia raises only one claim on appeal. She seeks reversal of the Commissioner's denial of disability insurance benefits, arguing that the Commissioner's decision to reject her subjective testimony was not supported by specific, clear, and convincing reasons.

## DISCUSSION

The ALJ did not err when he rejected Munguia's subjective testimony that she was unable to perform any work.

The ALJ is responsible for determining the credibility of witnesses, including the claimant, that testify before him or her. Magallanes, 881 F.2d at 750. To determine the

credibility of the claimant's testimony about subjective pain or symptoms, an ALJ must utilize a two-step analysis. Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). In the first step, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 1036 (citing Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991)). However, the claimant does not have to demonstrate that the underlying impairment could reasonably cause the subjective severity of the claimant's pain or symptoms; "she need only show that it could reasonably have caused some degree of the symptom." Id. (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)). If the claimant has presented objective medical evidence of an underlying impairment in the first step and there is no evidence of malingering, the ALJ must move to the second step. Id. In the second step, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Id. (quoting Smolen, 80 F.3d at 1281)). The ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony. See Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001)).

As noted, in step two of the five-step sequential disability determination analysis, the ALJ determined that Munguia suffered from several medically determinable impairments, including anemia, uterine fibroid tumors, right upper extremity phlebitis, diabetes mellitus, and obesity. Although the ALJ later determined that these did not meet or equal the listings at step three, the ALJ's impairment finding at step two of the analysis indicates that Munguia presented objective medical evidence of an underlying impairment that could reasonably cause some degree of the alleged symptoms. See Bunnell, 947 F.2d at 344. Because Munguia presented objective medical evidence of an underlying impairment and there was no evidence of malingering, the ALJ effectively proceeded to the second step of the Lingenfelter credibility test. See Lingenfelter, 504 F.3d at 1036.

Although Munguia correctly points out that the ALJ utilized an improper legal standard for rejecting her subjective testimony at the second stage of the <u>Lingenfelter</u> test, noting that the ALJ gave "specific and legitimate" reasons for rejecting Munguia's subjective testimony rather than the legally correct "specific, clear and convincing" standard, see <u>Lingenfelter</u>, 504 F.3d at 1036, any such error was harmless because the ALJ proffered five putatively "specific, clear, and convincing" reasons, as required, for rejecting Munguia's subjective testimony. Those reasons are as follows:

(1) Munguia's medical records describe "sparse treatment," missed appointments, and noncompliance with treatment regimens since her 2006 hospitalizations;

(2) Munguia's testimony about her elevated glucose levels is not corroborated by the objective medical record;

(3) Munguia's alleged right arm pain and inability to reach with her right arm are unsupported by the medical evidence;

(4) Munguia's testimony about her continuing fatigue and shortness of breath is not reflected in complaints registered in the medical record; and

(5) Munguia is raising six children by herself, and the energy necessary for this endeavor is "undoubtedly more" than that required from many sedentary or light jobs.

**1. Sparse Treatment, Missed Appointments, and Noncompliance with Treatment Regimens**

The ALJ correctly rejected Munguia's subjective testimony based in part on multiple missed appointments, noncompliance with prescribed treatment, and sparsity of treatment.

An ALJ is not required to believe every allegation of disabling pain or other symptoms. <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir. 1989). Rather, the ALJ is specifically tasked with determining the credibility of all witnesses in a disability proceeding. See <u>Magallanes</u>, 881 F.2d at 750. To find a pain or symptom allegation incredible, an ALJ

9

may rely on evidence establishing (1) an "unexplained . . . failure to seek treatment or follow a prescribed course of treatment;" Fair, 885 F.2d at 603; (2) "conservative treatment" inconsistent with the alleged symptoms; Parra v. Astrue, 481 F.3d 742, 751 (9th Cir 2007); or (3) daily activities inconsistent with the alleged symptoms. Fair, 885 F.2d at 603.

In this case, the ALJ cited two unexplained missed appointments in April 2008, a documented failure to comply with treatment regimens in March 2008, and a lack of follow-up treatment for any condition as one of the grounds for rejecting Munguia's subjective testimony. Munguia argues that the record must clearly show why she missed appointments and failed to follow prescribed medical therapy before the ALJ can draw a negative inference from these facts. However, this is clearly contrary to the law; in steps one through four of the five-step disability determination, the claimant has the burden of proving disability. Andrews, 53 F.3d at 1040. The ALJ rejected Munguia's subjective testimony while determining her residual functional capacity before step four. Therefore, Munguia had the burden of justifying her missed appointments and noncompliance with prescribed treatment. See Fair, 885 F.2d at 603 ("While there are any number of good reasons for [failing to seek treatment or follow a prescribed course of treatment], a claimant's failure to assert [a good reason] can cast doubt on the sincerity of the claimant's . . . testimony."). Munguia never offered an explanation for the missed appointments and the therapy noncompliance, so the ALJ rightfully considered this evidence to cast doubt on the validity of her subjective testimony.

Furthermore, the ALJ found that Munguia had undergone "sparse treatment" for her alleged impairments. Ninth Circuit precedent establishes that "conservative treatment" alone is sufficient to cast doubt on a claimant's subjective testimony. See Parra, 481 F.3d at 751. The ALJ reasonably interpreted the medical record as establishing that Munguia underwent "sparse treatment" for her impairments since her 2006 hospitalizations. Munguia missed multiple appointments and the record documented a failure to comply with prescribed medical treatment.

**2.      Elevated Glucose Testimony Not Corroborated by the Medical Record**

Munguia testified that she checks her glucose levels occasionally and the readings go "up past three and four's [sic]." Munguia's medical record documents at least fourteen glucose tests since January 2006. Of these, only one surpassed 300 mg/dL, and three surpassed 200 mg/dL. The ALJ correctly identified discrepancies between Munguia's testimony and the objective medical record. Then, the ALJ used these discrepancies to question the credibility of Munguia's subjective testimony.

Preliminarily, before discussing the ALJ's subjective credibility determination, it is important to address the ALJ's finding that Munguia did not suffer from listing level diabetes mellitus. At step two of the disability determination process, the ALJ found that Munguia suffered from "severe" diabetes mellitus, a finding that is supported by the record. However, this is not inconsistent with the ALJ's determination at step three that Munguia's diabetes mellitus did not meet listing level requirements.

The ALJ correctly determined that Munguia did not suffer from listing level diabetes mellitus. Although the medical record does show that Munguia suffers from diabetes mellitus, see STEDMAN'S MEDICAL DICTIONARY at 529, the disparity in the step three determination is possible because, according to the listings, diabetes mellitus is not a listing level disability until the medical record shows neuropathy, acidosis, or retinitis proliferans. See 20 C.F.R. § 404, Subpt. P, App. 1, § 9.08. Because the medical evidence in this case does not establish the necessary symptoms or test results for a listing level impairment, the ALJ correctly determined that Munguia did not suffer from listing level diabetes mellitus.

Although Munguia did not establish that she suffered from listing level diabetes mellitus, the ALJ nonetheless was required to weigh her subjective testimony about her diabetes in the residual functional capacity calculus. Ninth Circuit precedent allows ALJs to make adverse credibility inferences based on contradictions between the claimant's testimony and the relevant medical evidence. Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995). Furthermore, reviewing courts may not "reverse credibility determinations of an

ALJ based on contradictory or ambiguous evidence." Id. "Where the evidence is susceptible to more than one rational interpretation," a reviewing court must defer to the ALJ's decision. Burch, 400 F.3d at 680-81 (quoting Magallanes, 881 F.2d at 750). Here, the ALJ's determination that the inconsistencies between Munguia's testimony and the objective medical record tarnished the credibility of Munguia's testimony was a rational interpretation of the facts and was soundly based in the law. See Johnson, 60 F.3d at 1434.

### 3. Medical Evidence of Right Arm Pain and Reduced Right Arm Mobility

The ALJ found that "no significant positive objective findings with respect to [Munguia's] right upper extremity have been reported on examinations." Because the objective medical record did not reflect a significant underlying medical ailment, the ALJ refused to credit Munguia's subjective testimony of right arm reduced mobility and pain. Even though there are other rational interpretations, the court finds the ALJ's interpretation reasonable.

Munguia alleged right arm pain and reduced mobility stemming from a missed vein blood transfusion in July 2006. The medical evidence, however, did not reflect any complaints of right arm pain or reduced mobility until September 2007[6] during a visit to the Center. During this appointment, the examining physician diagnosed Munguia with right upper arm phlebitis and noted that Munguia's vein was distended. On a March 2008 visit to the Center, Munguia's arm pain was diagnosed as myalgia.

On February 20, 2007, before the 2007 and 2008 visits to the Center on complaints of arm pain but after the alleged 2006 faulty blood transfusion, the Sunnybrook Medical Group performed an internal medicine consultation on Munguia at the request of the Department of Social Security Services. During this consultative examination, Munguia did

---

[6] The ALJ's decision states that Munguia went to the Alameda County Medical Center with complaints of right arm pain in July 2007. (A.R. 10.) There is no evidence in the administrative record of a July 2007 visit to the Alameda County Medical Center. It appears that the ALJ simply confused the July 2006 hospitalization with the September 2007 visit to the Center.

12

not report a faulty blood transfusion nor did she allege reduced arm movement or pain. Instead, the medical records from this examination indicate that Munguia's shoulder abduction was to 180 degrees bilaterally. Finally, in a March 2007 case analysis, Munguia reported no manipulative limitations.[7]

It is questionable whether Munguia has proven "significant positive objective findings with respect to her upper extremity pain and reduced mobility." As stated above, Munguia was diagnosed in September 2007 with right upper extremity phlebitis and a distended vein and in March 2008 with myalgia. Therefore, Munguia presented the ALJ with medical evidence that something was wrong with her arm. However, the conflicting nature of these diagnoses is problematic; there was no medical consensus between the two examining doctors about the cause of Munguia's arm pain. The ALJ reasonably rejected the scant medical evidence about Munguia's arm pain and reduced mobility.

Even assuming that Munguia has given objective medical proof of an underlying illness, see Lingenfelter, 504 F.3d at 1036, the ALJ reasonably rejected her subjective testimony. If Munguia had presented clear objective evidence of an underlying illness, the ALJ could reject her subjective testimony about the severity of Munguia's symptoms only by stating specific, clear, and convincing reasons for doing so. See Lingenfelter, 504 F.3d at 1036. The ALJ has done that in this case.

Although the ALJ did not explicitly point to the other stated grounds for rejecting Munguia's subjective testimony when he discounted her allegations of arm pain and reduced mobility, these other factors convincingly militate against crediting Munguia's arm pain testimony. After she was diagnosed with phlebitis or myalgia, Munguia missed two appointments at the Center and did not provide an explanation for these missed visits. Furthermore, Munguia testified that she does household chores – laundry, cooking, and grocery shopping – that are not reasonably consistent with her subjective testimony of

---

[7] It is unclear from the record whether this was a result of self-reporting or an examination.

disabling pain. An unexplained failure to seek treatment and an ability to do daily activities inconsistent with the alleged symptoms are both grounds for rejecting the subjective testimony of a claimant. See Fair, 885 F.2d at 603.

The ALJ's interpretation of the facts was rational, and he reasonably rejected Munguia's subjective testimony about right arm pain and reduced mobility.

### 4.     Ongoing Fatigue and Shortness of Breath in the Medical Record

The ALJ refused to credit Munguia's testimony about her ongoing fatigue and shortness of breath because "her medical records fail to document such complaints." Munguia challenges this finding contending that "[t]he ALJ's depiction of the record is inaccurate."

Munguia's medical records reflect four complaints of fatigue or shortness of breath: during her two hospital stays in 2006, at a February 2007 Social Security disability evaluation, and at a March 2007 case analysis.[8] During the twenty-seven-month period for which Munguia provided medical records, she was examined at least eight times. Therefore, while the objective medical record shows somewhat sporadic complaints of fatigue and shortness of breath, it does display a pattern of complaints lasting longer than twelve months from January 2006 to February 2007. However, there is no recorded complaint of fatigue or shortness of breath after the February 2007 Social Security disability evaluation.

Taken as a whole, though, the ALJ's decision to discount Munguia's testimony based on the discrepancies between her testimony and the objective medical record is reasonable. The medical evidence records a fourteen-month period during which Munguia made no complaint of fatigue or shortness of breath. This is not an excessive pain case where the objective medical record does not reflect the subjective severity of the claimant's symptoms. See, e.g., Bunnell, 947 F.2d 341. Rather, the objective medical evidence in this

---

[8] The record is unclear whether the March 2007 report of fatigue and shortness of breath was the result of an examination or if it was simply part of an administrative summary of previous medical records.

14

case simply does not record the alleged symptoms of fatigue and shortness of breath for a majority of the time period for which Munguia provided medical records. Cf. Parra, 481 F.3d at 750 (finding that the claimant's testimony was not credible after citing medical records that conflicted with the claimant's testimony). Here, the discrepancy between the testimony and the medical record goes even further than in Parra; there are no medically documented complaints of fatigue and shortness of breath between February 2007 and April 2008.

The ALJ's determination that the discrepancies between Munguia's subjective testimony and her medical record were adequate grounds to question the credibility of Munguia's testimony was a rational interpretation of the facts.

### 5. Raising Six Children

Finally, the ALJ pointed to Munguia's home life as evidence of an ability to maintain a work burden exceeding that of "many sedentary or light jobs." Since Munguia's husband was deported, Munguia has been the sole adult caretaker of her six children. The ALJ specifically pointed to Munguia's testimony about her laundry and grocery shopping activities to support his finding that raising six children alone is inconsistent with a claim of chronic fatigue impairing Munguia's ability to do light or sedentary work.

Testimony about a claimant's daily activities which is inconsistent with the alleged symptoms is a reasonable basis for casting doubt on the credibility of a claimant's subjective testimony. Lingenfelter, 504 F.3d at 1040. However, "many home activities are not easily transferable to what may be the more grueling environment of the workplace . . . ." Fair, 885 F.2d at 603.

Munguia argues that her children are no longer babies – her children range in age from nine years-old to eighteen years-old – and, therefore, the children are often in school which gives Munguia "significant down time and rest periods." Additionally, Munguia testified that her oldest son does a significant amount of the basic household work.

While Munguia consistently asserts that her oldest son helps her with the household

tasks, Munguia's testimony indicates that she does many tasks such as laundry, grocery shopping, and cooking. The record clearly establishes that Munguia does extensive laundry work including carrying the laundry one block from her apartment to the apartment complex-supplied washing machines, waiting in the laundry room while the machines are running, placing the wet clothes back in the hamper, and hanging the clothes to dry. Munguia's testimony about her grocery shopping and cooking activities is not as extensive as her testimony about her laundry duties, but the record shows that Munguia goes grocery shopping and cooks, at least occasionally. (See A.R. 28.) (stating that "[w]hen I do go [shopping] it's only when I feel better"); (A.R. 39) (stating that "sometime [sic] I won't even cook;" thereby establishing that not cooking is the exception rather than the rule).

Munguia's household duties are not as extensive as those of the claimants in other Ninth Circuit cases whose claims were denied in part due to inconsistencies between daily activities and alleged symptoms. See Fair, 885 F.2d at 604 (stating that the claimant "remains capable of caring for all his own personal needs, the performance of his own routine household maintenance and shopping chores, riding public transportation, and driving his own automobile"); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (noting that the ALJ's determination that the claimant's "ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child served as evidence of [claimant's] ability to do work"); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (finding that claimant's "daily activities, such as attending to the needs of her two young children, cooking, housekeeping, laundry, shopping, attending therapy and various other meetings every week" undermined her claim of totally disabling pain). However, the ALJ's determination that Munguia's ability to do laundry, shop, and care for her six children was inconsistent with her alleged chronic fatigue symptoms was a rational interpretation of the facts. While it is true that common household duties often cannot be transferred to the workplace, see Fair, 885 F.2d at 603, the ALJ's finding that raising six children would involve an amount of work comparable to many sedentary or light jobs is reasonable.

**CONCLUSION**

For the foregoing reasons, the court GRANTS the Commissioner's cross-motion for summary judgment, DENIES Munguia's cross-motion for summary judgment, and AFFIRMS the Commissioner's final decision. The court finds that the ALJ gave clear, specific, and convincing reasons for rejecting Munguia's subjective testimony.

This order fully adjudicates the motions listed at numbers fourteen and fifteen of the clerk's docket for this case.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March 4, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge